**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRIENDS OF OUTLET CREEK,<br><br>Plaintiff,<br><br>v.<br><br>GRIST CREEK AGGREGATES, LLC,<br><br>Defendant. | Case No. 16-cv-00431-JSW<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION**<br><br>Re: Dkt. Nos. 35, 51 |

Now before the Court for consideration are the motion for partial summary judgment filed by Plaintiff Friends of Outlet Creek ("Plaintiff") and the cross-motion for summary judgment filed by Defendant Grist Creek Aggregates, LLC ("Defendant"). The Court has considered the parties' papers, relevant legal authority, and the record in this case, and the Court HEREBY GRANTS Plaintiff's motion and DENIES Defendant's cross-motion.

**BACKGROUND**

On January 25, 2016, Plaintiff filed its complaint against Defendant in which it asserted three claims for relief, all of which are based on alleged violations of the Clean Water Act ("CWA"): a claim for unlawful discharge without a National Pollution Elimination Discharge System ("NPDES") permit, in violation of 33 U.S.C sections 1311(a) and 1342; and two claims for unlawful discharge of fill materials without a Section 404 permit, in violation of 33 U.S.C. sections 1311(a), 1342, and 1344. The parties agreed to stay the latter two claims and submit the issues to the United States Army Corps of Engineers. (Dkt. No. 53.) Plaintiff now moves for summary judgment on its first claim for relief.

"Defendant conducts aggregate/gravel processing, washing, and storage, and concrete

1

1   recycling" at a 17-acre facility in Mendocino County (the "Facility"), which it acquired in

2   February 2011.  (Stipulation of Facts and Law ("Joint Stip.") ¶¶ 4, 6.)  Highway 162 borders the

3   south side of the Facility for approximately 1,900 feet, and Outlet Creek borders the north side of

4   the facility.  (*Id.* ¶ 5.)  Outlet Creek has been listed under "Section 303(d) of the CWA as impaired

5   due to sedimentation/siltation and temperature, and it is covered by the Upper Main Eel River and

6   Tributaries (including Tomki Creek, Outlet Creek and Lake Pillsbury) Total Maximum Daily

7   Loads for Temperature and Sediment."  (*Id.* ¶ 2.)  The Water Quality Control Plan for California's

8   North Coast Region has designated the beneficial uses for Outlet Creek "to include habitat for

9   rare, threatened, and endangered species and spawning and migration habitat."  (*Id.* ¶ 3.)

10       The industrial activities at the Facility fall within the coverage of the State Water

11   Resources Control Board Order No. 2014-0057-DWQ, National Pollutant Discharge Elimination

12   System Order No. CAS000001, General Permit for Storm Water Discharges Associated with

13   Industrial Activities, adopted April 1, 2014 ("IGP").  (*Id.* ¶ 9; *see also* Declaration of Rachel

14   Doughty ("Doughty Decl"), ¶ 4, Ex. 4 (Excerpts of IGP); Dkt. No. 46-3, Declaration of Sean

15   Hungerford ("Hungerford Decl."), ¶ 2, Ex. 1 (Excerpts of IGP).)[1]  Defendant filed a Notice of

16   Intent ("NOI") to obtain IGP coverage on February 5, 2013.  (Joint Stip. ¶ 10.)  The terms of the

17   IGP prohibit "[a]ll discharges of storm water to waters of the United States ... except as

18   specifically authorized by this General Permit or another NPDES Permit."  (Doughty Decl., Ex. 4,

19   IGP at 19.)

20       The California Department of Transportation ("Caltrans") operates and maintains Highway

21   162.  Highway 162 also is served by Caltrans' drainage ditches, swales, and culverts, which

22   collect and drain municipal storm water runoff from the highway as part of Caltrans' Municipal

23   Separate Storm Sewer System ("MS4").  (Joint Stip. ¶¶ 11-12.)  Caltrans is authorized to

24   discharge pollutants in municipal storm water associated with the state highway system, including

25   municipal storm water from Highway 162, through its MS4, pursuant to State Water Resources

---

[1] The Court grants the parties' requests to take judicial notice of the IGP.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689-90 (9th Cir. 2001); Fed. R. Evid. 201.

1  Control Board, Order No. 2012-011-DWQ, Statewide Storm Water Permit, Waste Discharge
2  Requirements for State of California, Department of Transportation ("Caltrans Permit").  (*Id.* ¶ 13;
3  *see also* Doughty Decl., ¶ 8, Ex. 8 (Excerpts of Caltrans Permit); Hungerford Decl., ¶ 3, Ex. 2
4  (Excerpts of Caltrans Permit).)[2]  Defendant is not a named permittee under the Caltrans Permit.
5  (Joint Stip. ¶ 22.)

6  Defendant owns and maintains a pipe (the "Bypass Pipe"), which is located underneath the
7  Facility.  The Bypass Pipe conveys and releases municipal storm water runoff from Highway 162,
8  and the pollutants that storm water contains, north of the Facility into Outlet Creek.  (*Id.*, ¶¶ 15-16,
9  18.)  "The intake for the Bypass Pipe is located in a culvert on the north side of Highway 162, in a
10 ditch approximately 400 feet east of the Facility entrance."  (*Id.* ¶ 14.)  There are a number of such
11 culverts along Highway 162 near the Facility, which existed before Defendant acquired the
12 Facility.  Defendant does not know who originally installed them.  (Declaration of Mel Goodwin
13 ("Goodwin Decl"), ¶¶ 4-5.)  The Bypass Pipe is not part of Caltrans' MS4.  (Joint Stip. ¶ 17.)

14 Defendant performed maintenance on the Bypass Pipe between 2011 and 2013.  Defendant
15 first replaced the portion of the Bypass Pipe from the inlet culvert to a sedimentation basin in the
16 Facility.  Subsequently, Defendant replaced the portion of the Bypass Pipe from the basin to the
17 north Facility boundary.  (Joint Stip. ¶¶ 18-19.)  The Bypass Pipe prevents municipal storm water
18 from Highway 162 from mixing or co-mingling with the Facility's industrial storm water.
19 Defendant does not treat or monitor pollutants in the municipal storm water that is conveyed
20 through the Bypass Pipe.  (*Id.* ¶ 21.)  Defendant does not have an individual NPDES permit
21 authorizing it to discharge pollutants in municipal storm water from Highway 162 into Outlet
22 Creek.  (*Id.* ¶ 23.)

23 The Court will address additional facts as necessary in its analysis.

## ANALYSIS

**A.    Legal Standards Applicable to Motion for Summary Judgment.**

"A party may move for summary judgment, identifying each claim or defense … on which

---
[2] The Court grants the parties' requests to take judicial notice of the Caltrans Permit.  *See Lee*, 250 F.3d at 689-90; Fed. R. Evid. 201.

3

1   summary judgment is sought." Fed. R. Civ. P. 56(a). A principal purpose of the summary
2   judgment procedure is to identify and dispose of factually unsupported claims. *Celotex Corp. v.*
3   *Catrett*, 477 U.S. 317, 323-24 (1986). Summary judgment, or partial summary judgment, is
4   proper "if the movant shows that there is no genuine dispute as to any material fact and the movant
5   is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not weigh
6   evidence or make determinations of credibility. Rather, "[t]he evidence of the non-movant is to be
7   believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*,
8   477 U.S. 242, 255 (1986).

9   The party moving for summary judgment bears the initial burden of identifying those
10  portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue
11  of material fact. *Celotex*, 477 U.S. at 323; *see also* Fed. R. Civ. P. 56(c). An issue of fact is
12  "genuine" only if there is sufficient evidence for a reasonable fact finder to find for the non-
13  moving party. *Anderson*, 477 U.S. at 248-49. A fact is "material" if it may affect the outcome of
14  the case. *Id.* at 248. If the party moving for summary judgment does not have the ultimate burden
15  of persuasion at trial, that party must produce evidence which either negates an essential element
16  of the non-moving party's claims or show that the non-moving party does not have enough
17  evidence of an essential element to carry its ultimate burden of persuasion at trial. *Nissan Fire &*
18  *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

19  Once the moving party meets its initial burden, the non-moving party must "identify with
20  reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91
21  F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th
22  Cir. 1995)). It is not the Court's task "to scour the record in search of a genuine issue of triable
23  fact." *Id.* (quoting *Richards*, 55 F.3d at 251); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need
24  consider only the cited materials, but it may consider other materials in the record."). "A mere
25  scintilla of evidence will not be sufficient to defeat a properly supported motion for summary
26  judgment; rather, the nonmoving party must introduce some significant probative evidence
27  tending to support the complaint." *Summers v. Teichert & Son, Inc.*, 127 F.3d 1150, 1152 (9th
28  Cir. 1997) (citation and internal quotation marks omitted). If the non-moving party fails to point

4

to evidence precluding summary judgment, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

### B. The Court Denies Defendant's Cross-Motion.

Defendant captioned its opposition to Plaintiff's motion as an opposition and cross-motion. Plaintiff asserts the Court should deny the motion as untimely. At the initial case management conference, the Court advised the parties that if they filed cross-motions for summary judgment, they should follow a four brief format. (Dkt. No. 20.) The parties stipulated to a briefing schedule on cross-motions, which called for Defendant to file the opening brief. At the parties' request, the Court extended those deadlines, and the deadline for Defendant to file its opening brief was extended to December 1, 2017. Plaintiff's deadline to oppose and cross-move was December 22, 2017. (Dkt. Nos. 30, 34.) Defendant did not file a motion on December 1, 2017, but Plaintiff timely filed its motion on December 22, 2017. On January 10, 2018, the Court granted the parties' stipulation to extend the deadlines to file Defendant's opposition and Plaintiff's reply. In that stipulation, the parties did not state that the Defendant's opposition would include a cross-motion and did not provide a deadline for Defendant to file a reply. However, the parties referred to the hearing date as a hearing on "cross-motions for summary judgment." (Dkt. No. 40.)

The Court finds Defendant's "cross-motion" is untimely, and it denies it on that basis. For the reasons set forth below, the Court also concludes that Defendant's arguments regarding standing and whether it discharges pollutants without a permit lack merit. Accordingly, the Court denies the motion for those reasons as well.

### C. Plaintiff Has Put Forth Sufficient Evidence to Show It Has Article III Standing.

Defendant argues that Plaintiff lacks standing to assert its claim.[3] In order for Plaintiff to establish Article III standing, it must show it "(1) suffered injury in fact, (2) that is fairly traceable to the challenged conduct of the [Defendant], (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, __ U.S. __, 136 S.Ct. 1540, 1547 (2016) (citing *Lujan*

---

[3] Based on the allegations in the Complaint, Plaintiff asserts standing on behalf of its members rather than based on its own interests as an organization. (*See* Compl. ¶ 5.) When the Court refers to Plaintiff's injuries in this Order, it is referring to injuries suffered by its members.

5

1  *v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). As an organization, Plaintiff has standing

2  to sue on behalf of its members "when its members would otherwise have standing to sue in their

3  own right, the interests at stake are germane to [its] purpose, and neither the claim asserted nor the

4  relief requested requires the participation of individual members in the lawsuit." *Friends of the*

5  *Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Defendant does not dispute that Plaintiff's members have suffered injury in fact, which requires a showing that "they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Id.* at 182. The parties stipulate to facts that show Plaintiff has associational standing to sue, and the declarations submitted by Plaintiff also set forth facts demonstrating injury in-fact. (*See, e.g.,* Joint Stip. ¶¶ 7-8; Declaration of Lyn Talkovsky, ¶¶ 4, 10-11; Declaration of Sue Crews, ¶¶ 2-3, 5-6; Declaration of Douglas Kerseg, ¶¶ 3, 6-7.)[4] Defendant also does not argue that the requested relief requires Plaintiff's members to participate in the lawsuit.

Rather, Defendant argues Plaintiff's injury is not "fairly traceable" to it, *i.e.* Plaintiff cannot establish Defendant caused its injury. "The jurisdictional question of standing precedes, and does not require, analysis of the merits." *Equity Lifestyle Props., Inc. v. Cty. of San Luis Obispo*, 548 F.3d 1184, 1189 n.10 (9th Cir. 2008). Defendant's causation argument is directed to the merits. For purposes of evaluating Plaintiff's standing to sue, the Court must assume Defendant discharges pollutants from the Bypass Pipe and does so without a permit, even though Defendant disputes those issues. *See, e.g., Havasupai Tribe v. Provencio*, 876 F.3d 1242, 1249 n.3 (9th Cir. 2017) (assuming for purposes of standing that Forest Service was required to approve continued mining that caused the plaintiffs' injuries, even though defendant disputed approval was required); *Ecological Rights Foundation v. Pacific Lumber Co.*, 230 F.3d 1141, 1151-52 (9th Cir. 2000) ("Requiring the plaintiff to show actual environmental harm as a condition for standing confuses the jurisdictional inquiry (does the court have power under Article III to hear the case?)

---

[4] Defendant objects to Ms. Talkovsky's declaration, on the basis that Plaintiff did not file a signed version. (*See* Dkt. No. 35-4.) Plaintiff filed a signed version on December 26, 2017, and Defendant has not articulated any prejudice from the delay in filing a signed version. Accordingly, the Court OVERRULES that objection.

with the merits inquiry (did the defendant violate the law?).").

In order to satisfy the traceability requirement, "the causal connection put forward for standing purposes cannot be too speculative, or rely on conjecture about the behavior of other parties, but need not be so airtight … as to demonstrate that the plaintiffs would succeed on the merits." *Ecological Rights*, 230 F.3d at 1152. In the *Ecological Rights* case, the plaintiffs argued their members' ability to enjoy activities on waterways downstream from the defendant's facilities were diminished because of defendant's alleged violations of the CWA. 230 F.3d at 1145, 1152. The court determined it "require[d] no attenuated chain of conjecture, and no presumptions that other actors will behave in any particular way, to link [defendant's] alleged illegal conduct to [the plaintiffs' members] diminished enjoyment of" the relevant waterway. *Id.* at 1152. Therefore, the court held the plaintiffs established the requisite causation for standing purposes. *Id.* at 1152-53.

Here, Plaintiff's declarants attest that their use of Outlet Creek has been diminished because of discharges emanating from the Bypass Pipe. Defendant argues that pollutants emanating from the Bypass Pipe are attributable solely to Caltrans' highway stormwater discharges and are not attributable to it. Defendant conflates the jurisdictional question of standing with the merits of the case, and the Court concludes Plaintiff has put forth sufficient evidence to demonstrate its injuries are traceable to Defendant. *See, e.g., San Francisco Baykeeper*, 791 F. Supp. 2d at 749 (concluding plaintiff had established traceability on summary judgment and that "[d]efendant's attempt to break the chain of causation by blaming other polluters is not sufficient for summary judgment purposes").

Defendant also argues that Plaintiff cannot show its injuries are redressable. Plaintiff seeks declaratory and injunctive relief as well as civil penalties. Defendant argues that an injunction will not redress Plaintiff's injuries, because it will not prevent discharges into Outlet Creek. "A plaintiff who seeks injunctive relief satisfies the requirement of redressability by alleging a continuing violation or the imminence of a future violation of an applicable statute or standard." *Nat. Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 995 (9th Cir. 2000) ("*Sw. Marine*"); *see also San Francisco Baykeeper v. West Bay Sanitary Dist.*, 791 F. Supp. 2d 719, 750 (N.D. Cal. 2011) (finding that plaintiff established that injunction could redress injury where plaintiff

7

contended that defendant continued to discharge pollutants into relevant waterways).  Here, as in the *Sw. Marine* and the *San Francisco Baykeeper* cases, Plaintiff contends that Defendant has discharged pollutants into Outlet Creek without a permit and that it continues to do so.  Further, even if pollutants may reach Outlet Creek from other sources, that fact is not fatal to Plaintiff's request for injunctive relief.  "Plaintiff need not establish that Defendant is solely responsible for the pollutants at issue; rather, Plaintiff must merely show that Defendant discharges a pollutant that contributes to the kinds of injuries alleged in the specific geographic area of concern."  *San Francisco Baykeeper*, 791 F. Supp. 2d at 750.  To the extent proof of that issue overlaps with the merits, the Court concludes that for the threshold standing inquiry, Plaintiff has established that an injunction could remedy its injuries.

Defendant does not address Plaintiff's request for civil penalties.  Therefore, the Court concludes it has waived any argument that Plaintiff's injuries could not be redressed by civil penalties.  Further, "[i]t can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress.  Civil penalties can fit that description."  *Friends of the Earth*, 528 U.S. at 185-86.

Accordingly, Plaintiff has met its burden to show it has standing to pursue the first claim for relief.

**D.    The Court Grants Plaintiff's Motion on the First Claim for Relief.**

"The Clean Water Act ['CWA'] is designed to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"  *Haw. Wildlife Fund v. Cty. of Maui*, 886 F.3d 737, 744 (9th Cir. 2018) (quoting 33 U.S.C. § 1251(a)).[5]  "To effectuate this objective, one of the CWA's principal sections strictly forbids discharges of pollutants into the 'navigable waters of the United States' without an NPDES permit from the Environmental Protection Agency."  *Nor. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 995 (9th Cir. 2007) (citing 33 U.S.C. § 1311(a)).  In order to prevail on its first claim for relief, Plaintiff must show

---

[5] Plaintiff brings its claim pursuant to the citizen suit provision of the CWA.  *See* 35 U.S.C. § 1365(a)(1).

8

1    Defendant "discharge[s] (2) a pollutant (3) to navigable waters (4) from a point source" without a

2    permit. *Haw. Wildlife,* 867 F.3d at 744 (quoting *Headwaters, Inc. v. Talent Irrigation Dist.*, 243

3    F.3d 526, 532 (9th Cir. 2001)); *see also Comm. to Save Mokelumne River v. East Bay Mun. Util.*

4    *Dist.*, 13 F.3d 305, 308 (9th Cir. 1993) ("*Mokelumne River*").

5         The parties do not dispute several of those elements, and the Court will address them at the

6    outset of the analysis. The parties do dispute whether Defendant "discharges" pollutants into

7    Outlet Creek. The Court concludes the answer to that question is yes. The parties also dispute

8    whether the discharges would be covered either by the IGP or by the Caltrans Permit. The Court

9    concludes the discharges are not covered by either permit.

         **1.**      **The Bypass Pipe Is A Point Source and the Municipal Storm Water Flowing Through It Contains Pollutants.**

12        The CWA defines a "point source" as "any discernible, confined and discrete conveyance,

13   including but not limited to any pipe, … from which pollutants are or may be discharged." 33

14   U.S.C. § 1362(14). Defendant argues that the Bypass Pipe is not the "relevant" point source, but it

15   does not dispute, and could not plausibly deny, that the Bypass Pipe satisfies the CWA's definition

16   of a point source. As set forth above, the CWA includes a pipe as a specific example of a point

17   source. The parties also do not dispute that the municipal storm water flowing through the Bypass

18   Pipe contains pollutants, which are defined by the CWA to include "industrial, municipal, and

19   agricultural waste discharged into water." 33 U.S.C. § 1362(6). Thus, the Bypass Pipe is a

20   "discernible, confined and discrete conveyance … from which pollutants … *may* be discharged,"

21   *i.e.* a "point source." *See Haw. Wildlife*, 867 F.3d at 744 (holding wells at issue were point

22   sources, based on plain language of statute, including use of "well" as a specific example of point

23   source).

24           **2.**      **Outlet Creek is a Navigable Water.**

25        The CWA defines the term "navigable waters" to mean the "waters of the United States,

26   including the territorial seas." 33 U.S.C. § 1362(7). The parties agree that Outlet Creek falls

27   within the definition of "navigable waters." (Joint Stip. ¶ 1.) The Court also concludes that Outlet

28   Creek, which is a tributary of the Eel River, falls within the definition of navigable waters. *See*

9

*Rapanos v. United States*, 547 U.S. 715, 732-33 (2006) (plurality opinion) (definition includes "relatively permanent, standing or flowing bodies of water," such as rivers, lakes and streams").

### 3. Defendant "Discharges" Pollutants Into Outlet Creek.

As set forth above, the parties dispute whether Defendant "discharges" pollutants into Outlet Creek within the meaning of the CWA. The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see also* 40 C.F.R. § 122.2 ("discharge of any pollutant" means "(a) [a]ny addition of any 'pollutant' or combination of pollutants to 'waters of the United States' from any 'point source'"). Defendant argues that because it does not add pollutants to the water in the Bypass Pipe, it does not "discharge" pollutants within the meaning of the CWA. The Court does not find Defendant's argument persuasive.

First, the text of the definition, which the Court concludes is plain and unambiguous, looks to whether pollutants are added to navigable waters *not* whether they are added to a point source. The municipal storm water that flows from the Bypass Pipe "adds" pollutants to Outlet Creek and, thus, falls within the plain language of the CWA's definition of discharge. Second, the Ninth Circuit has held "the Clean Water Act does not distinguish between those who add and those who convey what is added by others – the Act is indifferent to the originator of water pollution." *Nat. Res. Def. Council, Inc. v. Cty. of Los Angeles*, 673 F.3d 880, 900 (9th Cir. 2011) ("*N.R.D.C. I*"), *rev'd on other grounds sub. nom. Los Angeles Cty. Flood Control Dist. v. Nat. Res. Def. Council, Inc.*, 568 U.S. 78 (2013); *see also W.V. Highlands Conservancy v. Huffman*, 625 F.3d 159, 167 (4th Cir. 2010) ("*Huffman*") ("[T]he statute takes the water's point of view: water is indifferent about who initially polluted it so long as pollution continues to occur.") (quoted with approval in *N.R.D.C. I,* 673 F.3d at 895); *Cal. Sportfishing Protection Alliance v. Shiloh Group, LLC*, 268 F. Supp. 3d 1029, 1044 (N.D. Cal. 2017) (noting that the Ninth Circuit interprets the definition of discharge "broadly to prohibit discharges by those who merely convey pollutants, and who do not generate pollutants or add them to storm water").

In the *Mokelumne River* case, the defendants purchased a portion of an abandoned mine property and built a facility on the property that was designed "to reduce the threat of continued

10

toxic runoff from the site." 13 F.3d at 306-07. The parties did not dispute most of the elements of the plaintiff's CWA claim, but the defendants argued they had not added pollutants to the Mokelumne River, which was the navigable water at issue. The defendants' theory was that the point source, a dam, did "no more than impound navigable waters and impede their flow in the Mokelumne River." *Id.* at 308. The Ninth Circuit rejected this argument and concluded "the source of pollution added to the Mokelumne River is 'surface runoff that is collected or channeled by' defendants from the abandoned mine site. Such surface runoff is expressly listed under the definition of 'discharge of a pollutant' contained in the regulations." *Id.* (citing 40 C.F.R. § 122.2). Thus, the court held the defendants were liable under the CWA even though they had not generated the pollutants that were discharged into the river.

Similarly, in the *Huffman* case, the defendant, the West Virginia Department of Environmental Protection required mine operators to post bonds to guarantee compliance with NPDES permits that required mine operators to "neutralize the adverse effects of" of acid mine drainage. 625 F.3d at 163. If mine operators violated their duties, the defendant could revoke their permits and "force the performance bonds into forfeiture" ("bond forfeiture sites"). *Id.* The plaintiff argued the defendant was required to obtain its own permits to cover discharges from a number of bond forfeiture sites. The defendant argued that it did not create the pollutants at issue and, therefore, should not be held liable. *Id.* at 164-65. The court rejected defendant's causation argument. Relying on the plain language of the CWA, the plain language of federal regulations, and case law, including the *Mokelumne River* case, the court reasoned that "under the CWA, the question of who generated pollutants is irrelevant. What matters is who is currently discharging pollutants into navigable waters." 625 F.3d at 168 (citing, *inter alia*, *S. Fla. Water Mgmt. Dist. v. Miccosukke Tribe*, 541 U.S. 95, 104-05 (2004) and *Mokelumne River*, 13 F.3d at 309).

The *Huffman* court also relied on *Sierra Club v. El Paso Gold Mines, Inc.*, 421 F.3d 1133 (10th Cir. 2005). In that case, the defendant was a successor owner to property on which an abandoned mine, collapsed mine shaft, and a drainage tunnel were located. The facts showed that water entered into the tunnel in various ways and emptied into navigable waters. *Id.* at 1136. As Defendant does here, the defendant argued that to "discharge" pollutants under the CWA,

11

"affirmative conduct" was required. It argued that it had not engaged in such conduct because it had not constructed the mine and did not conduct any mining operations. Rather, it was a passive landowner. *Id.* at 1137, 1143. The court agreed with the defendant that "the term 'addition' implied affirmative conduct," but it held that, when viewed in context, "the liability and permitting sections of the [CWA] focus on the point of discharge, not the underlying conduct that led to the discharge." *Id.* at 1143-1144. The court also reasoned that the regulatory definition of discharge showed "that ownership of a point source will trigger liability." *Id.* (citing 40 C.F.R. § 122.2). Thus, the court held the defendant could be liable for discharges from the mine shaft, but found there were disputed issues of fact as to whether pollutants discharged into the mine shaft actually made their way into the navigable waters at issue. *Id.* at 1146, 1149-50.

The Court finds the reasoning of these cases persuasive, and it concludes the proper query is not whether Defendant generates the pollutants that are released but whether it controls the point source that releases them. The undisputed facts show Defendant does control that source. (Joint Stip. ¶16.) The Court's conclusion is reinforced by 40 C.F.R. section 122.2, which states that the definition of discharge includes "additions of pollutants into waters of the United States from: surface runoff which is collected or channeled by man[.]" 40 C.F.R. § 122.2. To "collect" something means to "bring together into one body or place." Webster's New Collegiate Dictionary at 219 (1979). To "channel" something means "to convey into or through a channel." *Id.* at 184. The parties stipulate that the Bypass Pipe "conveys municipal storm water runoff from Highway 162 to Outlet Creek." (Joint Stip. ¶ 15.) Therefore, the parties' stipulations demonstrate that Defendant "discharges" pollutants as that term is defined in the relevant regulations.

Defendant also argues that it does not "discharge" pollutants because the Bypass Pipe merely passes the municipal storm water from one location to another, relying, *inter alia*, on *Nat. Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580 (6th Cir. 1988) and *Nat. Wildlife Fed'n v. Gorsuch*, 693 F.2d 156 (D.C. Cir. 1982). In *Consumers Power*, the court determined the defendant was not liable because it had not introduced any pollutants from the outside world into the waters at issue, rather the pollutants at issue "always remain within the waters of the United States, and hence cannot be added." *Consumers Power*, 862 F.2d at 585-86; *accord Gorsuch*, 693

12

1   F.2d at 172, 175 (holding EPA's interpretation of the term "addition" to require introduction of a
2   pollutant from the outside world was reasonable and finding pollutants at issue, changes in water
3   conditions from operation of dam, were not introduced from the outside world).  In this case,
4   however, the water at issue is not simply moving from one portion of Outlet Creek to another
5   portion of the creek.  Further, given the nature of the pollutants, municipal storm water run-off,
6   they are added to Outlet Creek from the outside world.  Therefore, the Court concludes
7   Defendant's reliance on these cases is inapposite.

8   Accordingly, the Court concludes Defendant "discharges" pollutants into Outlet Creek
9   from the Bypass Pipe.

### 4. Defendant Does Not Have A Permit That Covers Discharges from the Bypass Pipe.

12  Although the Court has found that Defendant discharges pollutants through the Bypass
13  Pipe into Outlet Creek, Defendant will be liable for violating the CWA only if it lacks a permit to
14  do so.  Defendant argues that the Caltrans Permit and the IGP would cover the discharges.

#### a. The Caltrans Permit.

16  The following facts are not disputed.  Caltrans Permit covers discharges of municipal
17  storm water from Caltrans MS4 system.  The Bypass Pipe is not part of the MS4 system.
18  Defendant is not a party to the Caltrans Permit.  Defendant argues that the Caltrans Permit does
19  cover the discharges because Plaintiff mischaracterizes the point source and the relevant point
20  sources should be the ditches maintained by Caltrans which lead to the intake for the Bypass Pipe.
21  For the reasons set forth in the preceding section, the Court rejects that argument.  Therefore,
22  Defendant cannot rely on the Caltrans Permit to show it is not liable for discharges from the
23  Bypass Pipe.  *See San Francisco Baykeeper*, 791 F. Supp. 2d at 771-72 (concluding that defendant
24  could not obtain vicarious benefit of permit to which it was not a party and where there was
25  nothing to establish it was a third party beneficiary of permit).[6]

---

[6]   Defendant has not argued it is a third-party beneficiary of the Caltrans Permit.

### b. The IGP.

Defendant also argues the terms of the IGP show it is not liable for any discharges from the Bypass Pipe. The Court applies the usual rules of contract interpretation to NDPES permits. *See, e.g., Nat. Res. Def. Council v. Cty. of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013) ("*N.R.D.C. II*"). "If the language of the permit, considered in light of the structure of the permit as a whole, 'is plain and capable of legal construction, the language alone must determine the permit's meaning.' … If the permit's language is ambiguous, we may turn to extrinsic evidence to interpret its terms." *Id.* (quoting *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty., Md.*, 268 F.3d 255, 270 (4th Cir. 2001)). The Court "'must give effect to every word or term' in an NPDES permit 'and reject none as meaningless or surplusage.'" *Id.* at 1206 (quoting *In re Crystal Props., Ltd., L.P.*, 268 F.3d 743, 748 (9th Cir. 2001)); *see also* Restatement (Second) of Contracts § 203(a)) (1981) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation that leaves a part unreasonable, unlawful, or of no effect.") (quoted with approval in *N.R.D.C. II*, 725 F.3d at 1206).

The IGP authorizes "discharges of industrial storm water to waters of the United States, so long as those discharges comply with all requirements, provisions, limitations, and prohibitions in this General Permit." (Doughty Decl., Ex. 4, IGP at 2.) The IGP also provides that "[d]ischarges of storm water regulated under another individual or general NDPES permit adopted by the State Water Board or Regional Water Board are not covered under this General Permit[.]" (*Id.*, IGP at 3.) As with any contract, the IGP's terms "are to be given their ordinary meaning, and" if those terms are clear, "the intent of the parties must be ascertained from" the IGP itself. *N.R.D.C. II*, 725 F.3d at 1205 (quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 120 (9th Cir. 1999)). It is undisputed that the water discharged through the Bypass Pipe is municipal storm water. Based on the plain language of the IGP, it would not cover the discharge of municipal storm water regulated under another permit. (*See also* Opp. Br. at 21 ("The IGP also is plain that it does not provide coverage for discharges regulated under other NPDES permits.").)

Defendant argues the portions of the IGP addressing "run-on" demonstrate that the State

Water Board did not intend for IGP permit holders to be liable for the effects of discharges from run-on. The term "run-on" is defined as "[d]ischarges that originate offsite and flow onto the property of a separate facility or property[.]" (Hungerford Decl., Ex. 1, IGP, Att. C, Glossary at 6.) The IGP's best management practices ("BMPs") require a "discharger" to "[d]ivert run-on … away from all stockpiled materials" and to "[d]ivert run-on … away from all erodible materials[.]" (*Id.*, IGP at 32; *see also id.* IGP Fact Sheet at 35-36 ("This General Permit … requires dischargers to divert run-on from non-industrial sources … away from industrial materials and erodible surfaces.").)[7] Defendant also notes the IGP contains a provision that states "[s]ources of non-industrial pollutants that are discharged separately and are not comingled with storm water associated with industrial activity are not considered subject to this General Permit's requirements." (*Id.*, IGP Fact Sheet at 64.)

According to Defendant, the municipal storm water from Highway 162 constitutes run-on and the Bypass Pipe is the means by which it has diverted that run-on away from its industrial materials and erodible surfaces. It is clear Defendant is required to divert run-on in order to comply with the terms of the IGP. It does not follow, however, that compliance with those terms means it is absolved from liability under the CWA if the result is that it discharges pollutants not covered by the IGP into navigable waters. Defendant also argues the terms of the IGP demonstrate that "[d]ischarges 'attributable solely to pollutants originating from non-industrial pollutant sources (<u>such as run-on from adjacent facilities</u> …)' do not violate the IGP." (Opp. Br. at 21:2-3 (citing Hungerford Decl., Ex. 1, IGP at 12 and IGP Fact Sheet at 64) (emphasis in original).) The first section of the IGP on which Defendant relies refers to Numeric Action Level ("NAL") Exceedances and provides:

---

[7] The IGP defines "discharger" to mean "[a] person, company, agency, or other entity that is the operator of the industrial facility covered by this General Permit." *See* https://www.waterboards.ca.gov/water_issues/programs/stormwater/igp_20140057dwq.shtml IGP, Attachment C, Glossary at 2 (last visited April 11, 2018).

15

> Exceedances of the [Numeric Action Level] NALs that are attributable solely to pollutants originating from non-industrial pollutant sources (such as run-on from adjacent facilities, non-industrial portions of the Discharger's property, or aerial deposition) are not a violation of this General Permit because the NALs are designed to provide feedback on industrial sources of pollutants. Dischargers may submit a Non-Industrial Source Pollutant Demonstration as part of their Level 2 ERA Technical Report to demonstrate that the presence of a pollutant causing an NAL exceedance is attributable solely to pollutants originating from non-industrial pollutant sources.

(Hungerford Decl., Ex. 1 IGP at 12.)  Again, the Court concludes that while there may be circumstances that would not result in a violation of the terms of the IGP, that does not translate to permission for Defendant to discharge other pollutants without a separate permit.

Finally, Defendant also argues the Regional Water Board inspected the Facility several times after the Bypass Pipe was completed and found that the Facility was in compliance with the IGP.  (Def. RJN., ¶ 3, Hungerford Decl., ¶ 3 (Site Inspection Reports).)[8]  Defendant argues that the Regional Board's position on this point, if not binding, is a least entitled to deference.  The Court also is not persuaded by this argument because non-enforcement does not equate to compliance. *See, e.g., Cal. Sportfishing Protection Alliance v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128, 1148 (E.D. Cal. 2016).

In sum, the Court concludes the IGP cannot be reasonably interpreted to absolve defendant from liability for the discharges from the Bypass Pipe.

**CONCLUSION**

For the reasons set forth above, the Court holds that Defendant is discharging pollutants into navigable waters without a permit, in violation of the CWA.  Plaintiff is entitled to summary judgment on its first claim for relief.  With the exception of its standing argument, which the Court rejected, Defendant has not otherwise challenged Plaintiff's entitlement to the forms of relief it seeks.

Therefore, the Court declares Defendant to have violated and to be in violation of Sections

---

[8] Plaintiff has not objected to Defendant's request and has not challenged the facts set forth in those inspections.  Accordingly, the Court GRANTS Defendant's request to take judicial notice of the site inspections attached as Exhibit 3 to the Hungerford Declaration.

301(a), and 402 of the Clean Water Act, 33 U.S.C. sections 1311(a) and 1342, for its unlawful discharges from the Bypass Pipe into Outlet Creek.

Defendant shall pay civil monetary penalties for each of the 70 violation of the Clean Water Act at $37,500 per day per violation for violations occurring since on or about May 1, 2011, and $51,570 per day per violation since November 3, 2015, as permitted by 33 U.S.C. section 1319(d) and Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. section 19.4, for the dates set forth in Exhibit 14 to the declaration of Rachel Doughty.

The Court also orders that Defendant and its officers, agents, servants, employees, and attorneys and other persons who are in active concert or participation with Defendant and its officers, agents, servants, employees and attorneys shall be enjoined from further discharges into Outlet Creek via the Bypass Pipe unless and until it obtains a permit for those discharges. The parties shall meet and confer and, within fourteen (14) days of this Order, submit a proposed form of injunction to the Court that complies with the requirements of Federal Rule of Civil Procedure 65.

Plaintiff also asks the Court for its reasonable costs of suit, including attorneys' fees. Plaintiff shall follow the procedures set forth in Northern District Local Rule 54 with respect to that request.

Finally, the Court has stayed the litigation on Plaintiff's second and third claims for relief. Within fourteen (14) days of the date of this Order, the parties shall file a joint brief setting forth their positions on whether the Court should enter a partial judgment on the first claim for relief.

**IT IS SO ORDERED.**

Dated: April 23, 2018

_____
JEFFREY S. WHITE
United States District Judge