RACHEL S. DOUGHTY, SBN 255904
GREENFIRE LAW, PC
2550 Ninth Street, Suite 204B
Berkeley, CA 94710
Telephone: (828) 424-2005
Email: rdoughty@greenfirelaw.com

JASON R. FLANDERS, SBN 238007
AMANDA M. PRASUHN, SBN 306718
ATA LAW GROUP
490 43rd St., Suite 108
Oakland, CA 94609
Telephone: (916) 202-3018
Email: jrf@atalawgroup.com

*Attorneys for Plaintiff*
*Friends of Outlet Creek*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| FRIENDS OF OUTLET CREEK,<br><br>　　Plaintiff,<br>　vs.<br><br>GRIST CREEK AGGREGATES, LLC,<br><br>　　Defendant. | Case No. 4:16-cv-00431-JSW<br><br>**SUPPLEMENTAL MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Complaint Served: February 29, 2016<br><br>(*Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq.*) |

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................1

SUMMARY OF ISSUES TO BE DETERMINED ....................................................................1

STATEMENT OF FACTS .........................................................................................................2

STANDARD OF REVIEW ........................................................................................................2

ARGUMENT ..............................................................................................................................3

A.  The Bypass Pipe Discharges Require an NPDES Permit as Matter of Law. .........................3

B.  Defendant in Fact Discharges One or More Pollutants from the Bypass Pipe. .....................4

   1.  Caltrans Reports Pollutants in 100% of Highway Stormwater Discharges. ......................5

   2.  SWRCB Found Pollutants in Caltrans' Highway Stormwater ............................................5

   3.  Defendant Admits Highway 162 Runoff Contains Pollutants. ...........................................6

   4.  Plaintiff's Testimony Shows Pollutants Entering the Bypass Pipe. ....................................7

   5.  Plaintiff's Expert Opines that the Bypass Pipe Discharges Pollutants. ...............................8

   6.  Defendant Submitted No Facts Disputing the Evidence, Above. .......................................9

C.  The Court Did Not Err in its Initial Assessment of Statutory Penalties. ..............................11

**CONCLUSION** ........................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) ............................................................. 3

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................... 2, 3

*Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128 (11th Cir. 1990) ................. 12

*Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128 (E.D.Cal. 2016) ........................................................................................................................ 2, 3

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................................ 2, 3

*Comm. to Save Mokelumne River v. East Bay Mun. Utility Dist.*, 13 F.3d 305 (9th Cir. 1993) 1, 14

*Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502 (9th Cir. 2013) ........................ 3

*Friends of the Earth, Inc. v. Laidlaw Envtl. Services*, 528 U.S. 167 (2000) ................................ 13

*Hawaii's Thousand Friends v. City & Cty. of Honolulu*, 821 F. Supp. 1368 (D. Haw. 1993) ...... 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................................... 3

*Mayweathers v. Terhune*, 328 F. Supp. 2d 1086 (E.D. Cal. 2004) ................................................. 2

*Natural Resources Defense Council v. Southwest Marine, Inc.*, 236 F.3d 985 (9th Cir. 2000) ... 12

*Puget Soundkeeper Alliance v. Cruise Terminals of Am., LLC*, 216 F.Supp.3d 1198 (W.D. Wash. 2015) ................................................................................................................................. 1, 14

*Puget Soundkeeper Alliance v. Whitley Mfg. Co.*, 145 F.Supp.3d 1054 (W.D.Wash. 2015) ...... 1, 3

*UMG Recordings, Inc. v. Sinnott*, 300 F. Supp. 2d 993 (E.D. Cal. 2004) ...................................... 2

**Statutes**

33 U.S.C. § 1319(d) ....................................................................................................................... 12

33 U.S.C. § 1362(6) ......................................................................................................................... 4

42 U.S.C. § 1342(p) ......................................................................................................................... 4

**Rules**

40 C.F.R. § 122.26(b)(8) .................................................................................................................. 4

40 C.F.R. § 19.4 ............................................................................................................................. 12

## INTRODUCTION

Pursuant Court Order (Dkt. 74), Plaintiff Friends of Outlet Creek submits this supplemental brief in support of Plaintiff's motion for summary judgment (Dkt. 35) on the issues of pollutants and penalties. As directed by the Court, Plaintiff's evidence herein is solely "based on the existing record" (Dkt. 74, 3:18), limited to the declarations and requests for judicial notice submitted in support of and opposition to Plaintiff's motion for summary judgment. The existing record demonstrates that Defendant has not presented facts supporting any reasonable dispute that Defendant's Bypass Pipe discharges pollutants. In addition, Plaintiff requests that the Court reinstate its penalty determination of April 23, 2018, finding seventy (70) days of violation. In the alternative, Plaintiff has presented undisputed evidence of at least one hundred and forty (140) days of violation.

## SUMMARY OF ISSUES TO BE DETERMINED

**First, does Defendant's Bypass Pipe discharge any pollutant requiring a CWA permit?** Yes. Congress has classified MS4 stormwater, which the Bypass Pipe discharges, to be a CWA pollutant as a matter of law. *See Puget Soundkeeper Alliance v. Whitley Mfg. Co.*, 145 F.Supp.3d 1054, 1057 (W.D.Wash. 2015) ("plaintiff need not prove that defendant's stormwater contained a particular substance in a particular quantity because Congress, in enacting § 1342(p), determined that defendant's stormwater is, in and of itself, a pollutant"). Even were the Court to turn to the question of fact, the overwhelming and incontrovertible evidence demonstrates that runoff from Caltrans' state highway system universally contains pollutants, a fact corroborated by Caltrans' own sampling, findings of the California State Water Resources Control Board ("SWRCB"), and by both Plaintiff's and Defendant's testimony. In contrast, Plaintiff's burden of proof under the CWA is exceedingly low, and Defendant is not entitled to even a *de minimis* defense. *See Comm. to Save Mokelumne River v. East Bay Mun. Utility Dist.*, 13 F.3d 305, 309 (9th Cir. 1993), cert. denied, 513 U.S. 873 ("the Act categorically prohibits *any* discharge of a pollutant from a point source without a permit," [emphasis added]); *Puget*

*Soundkeeper*, *supra*, 216 F.Supp.3d at 1205 ("Liability for a violation of the Clean Water Act is strict, i.e., there is no *de minimis* defense").

**Second, what penalties should be assessed for Defendant's past and ongoing discharges of pollutants to waters of the United States without a CWA permit?** Here, the Court need not consider or weigh the facts or circumstances surrounding each documented violation, and may simply apply the statutory penalties as the Court previously did. *See Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128, 1155 (E.D.Cal. 2016) ("Once the court has calculated maximum civil penalties, the court *may* proceed to adjust downward from this maximum based on statutory factors" [emphasis added].) While the Court previously found seventy (70) days of violations where precipitation equaled at least one inch, Plaintiff provides further evidence based on the existing record that the Bypass Pipe illegally discharged at least one hundred and forty (140) days in violation of the CWA.

## STATEMENT OF FACTS

Because the Court has ordered these supplemental briefs on reconsideration to be based solely on the "existing factual record," Plaintiff's facts are those set forth in its memoranda in support of summary judgment (Dkt. 35, 56) and in the Parties' Stipulation of Facts and Law ("Stipulation," Dkt. 57), hereby incorporated by reference.

## STANDARD OF REVIEW

The court in *California Sportfishing Protection Alliance v. River City Waste Recyclers* recently summarized and applied summary judgment standards in a CWA citizen suit:

> The 'threshold inquiry' is whether 'there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 [citation omitted]. When the court looks at the evidence presented by the parties, '[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in . . . [the] [non-movant's] favor.' *Id.* at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *See Mayweathers v. Terhune*, 328 F. Supp. 2d 1086, 1092-93 (E.D. Cal. 2004); *UMG Recordings, Inc. v. Sinnott*, 300 F. Supp. 2d 993, 997 (E.D. Cal. 2004).
>
> The moving party bears the initial burden of demonstrating to the court 'that there is an absence of evidence to support the non-moving party's case.' *Celotex*, 477 U.S. at 325.

[¶ . . .]

Once the moving party satisfies this initial burden, the burden then shifts to the non-moving party, who 'must establish that there is a genuine issue of material fact . . . .' *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 [citation omitted]. . . . A factual dispute is 'genuine' where the evidence is such that 'a reasonable jury could return a verdict for the non-moving party.' [*Anderson*, 477 U.S. at 248.] The non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.' *Id.* at 586. Rather, to survive summary judgment, the non-moving party must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.' *Celotex*, 477 U.S. at 322.

205 F. Supp. 3d 1128, 1144-1145 (E.D.Cal. 2016). "A scintilla of evidence or evidence that is merely colorable or not significantly probative does not present a genuine issue of material fact." *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

## **ARGUMENT**

### A. The Bypass Pipe Discharges Require an NPDES Permit as Matter of Law.

The CWA defines "pollutant" to include "municipal waste," and accordingly, *per se* <u>requires</u> an NPDES permit for any discharge of municipal stormwater. The CWA states that no NPDES permit shall be required "for discharges composed <u>entirely</u> of stormwater" *except* for several specific sources, including "[a] discharge from a municipal separate storm sewer system . . . ." 42 U.S.C. § 1342(p)(1)-(2)[emphasis added]. Congress added this direction in section 1342(p) to rectify a U.S. Environmental Protection Agency ("EPA") regulatory exemption of stormwater discharges from permitting. *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502, 505 (9th Cir. 2013); *Puget Soundkeeper Alliance v. Whitley Mfg. Co.*, 145 F. Supp. 3d 1054, 1056 (W.D.Wash. 2015) ("Congress stepped in and required permits for stormwater discharges emanating from <u>presumptively</u> dirty sources" [emphasis added]). Thus, <u>any</u> discharge of municipal stormwater from a covered MS4 is *required* to obtain an NPDES permit. *Cf. Puget Soundkeeper*, *supra*, 145 F.Supp.3d at 1057 ("plaintiff need not prove that defendant's stormwater contained a particular substance in a particular quantity because Congress, in enacting § 1342(p), determined that defendant's stormwater is, in and of itself, a pollutant.") Here, according to the SWRCB NPDES Permit issued to Caltrans, "[a]ll MS4s under the

Department's jurisdiction are considered one system." (Declaration of Rachel S. Doughty, Dkt. 36 ("Doughty Dec.") at 110.[1]) Thus, pursuant to statute (42 U.S.C. § 1342(p)), regulation (40 C.F.R. § 122.26(b)(8)), and SWRCB findings, <u>any</u> discharge of stormwater from Caltrans' highway system <u>must</u> be covered by an NPDES permit.

Here, Defendant admits that "[t]he Bypass Pipe conveys Highway 162 <u>municipal storm water</u>, and the pollutants it contains, under the Facility to release north of the Facility into Outlet Creek." Stipulation, ¶ 18 (emphasis added). Because Defendant does not dispute that the Bypass Pipe discharges municipal stormwater from Caltrans' highway system, and because Congress, EPA, and SWRCB all have determined that all discharges of Caltrans stormwater to waters must be covered by an NPDES permit, Defendant cannot discharge Caltrans stormwater without an NPDES permit as a matter of law.

### B. Defendant in Fact Discharges One or More Pollutants from the Bypass Pipe.

The facts in evidence show why Congress presumed that municipal stormwater contains pollutants and requires an NPDES permit as a matter of law. A "pollutant" under the CWA includes but is not limited to "solid waste, . . . sewage, garbage, . . . chemical wastes, biological materials, . . . heat, wrecked or discarded equipment, rock, sand, . . . and industrial, municipal, and agricultural waste . . . ." 33 U.S.C. § 1362(6). A Caltrans stormwater characterization study found these pollutants in <u>100%</u> of samples obtained; the SWRCB describes extensive pollutants in Caltrans' stormwater; Defendant has testified to observing and running lab analyses showing pollutants in the Bypass Pipe; and Plaintiff has testified to observing and running lab analyses showing pollutants in the Bypass Pipe. Defendant further admits it discharges any pollutants entering the Bypass Pipe, stipulating that: "[t]he Bypass Pipe conveys Highway 162 municipal storm water, and the pollutants it contains, under the Facility to release north of the Facility into Outlet Creek," (Stipulation, ¶ 18); and further admits that "Defendant does not treat . . .

---

[1] Page references herein to the parties' declarations with exhibits filed in support of and opposition to Plaintiff's Motion for Summary Judgment cite to the ECF generated pdf page number.

Plaintiff FOC's Supp. Mem. ISO MSJ  4

pollutants in stormwater that is conveyed through the Bypass Pipe." Def. Mem., Dkt. 51 at 10. Thus, Defendant admits that the Bypass Pipe discharges any and all pollutants present in Caltrans' Highway 162 runoff. In turn, there can be no reasonable dispute that stormwater discharging from this state highway contains one or more pollutants.

### 1. Caltrans Reports Pollutants in 100% of Highway Stormwater Discharges.

In 2003, Caltrans completed "one of the most comprehensive stormwater runoff characterization studies available for transportation facilities." Doughty Decl., Dkt. 36 at 114 (Caltrans Discharge Study). The Caltrans Discharge Study included "over 60,000 data points from over 180 monitoring sites" and was "designed to be representative of transportation facilities throughout the state." *Id*. The summary of sampling results from state highways shows pollutants including copper, zinc (total), pH, temperature, coliform, dissolved organic carbon ("DOC"), and total organic carbon ("TOC"), <u>each present in 100% of state highway samples</u>; total suspended solids ("TSS") and zinc (dissolved) each present in 99% of state highway samples; and diesel and chromium each present in 97% of state highway samples. Doughty Decl., Dkt. 36 at 115 (Caltrans Discharge Study). This evidence is overwhelming and indisputable that Caltrans' highway stormwater discharges contain pollutants.

### 2. SWRCB Found Pollutants in Caltrans' Highway Stormwater.

SWRCB's Caltrans Storm Water Permit identifies a variety of sources contributing pollutants to state highway runoff,

> [i]nclud[ing] motor vehicles, highway surface materials such as fine particles of asphalt and concrete, highway maintenance products, construction activities, erodible shoulder materials, eroding cut and filled slopes, abrasive sand and deicing salts used in winter operations, abraded tire rubber, maintenance facilities, illegal connections, illegal dumping, fluids from accidents and spills, and landscape care products.

Doughty Decl., Dkt. 36 at 109 (Caltrans Storm Water Permit). SWRCB further explains:

> [t]he main transport mechanism for these pollutants is through fine sediment. Once the contaminated fine sediments wash off the roadways and into storm drains or nearby receiving waters they re-suspend in the water column and become bioavailable.

> Metals including copper, zinc, lead, cadmium, nickel and chromium are toxic to aquatic life and cause impairments to California's waterbodies. Toxic metals are present in water as both dissolved and total recoverable fractions. During times of high precipitation (storm events), the primary transport mechanism for metals, especially in the total recoverable fraction, is again the mobilization of fine sediment. Accumulated contaminated fine sediment washes off roadways and into storm drains or nearby receiving waters. Metals in the sediment become bioavailable while suspended in the water column. During times of low precipitation, flows that reach storm drains or discharge points are typically insufficient to mobilize fine sediment, but dissolved metal ions are still bioavailable and reach discharge points. Mechanical components of automobiles, especially those that are subjected to frictional stresses are either known or supposed sources of these metals (i.e., copper from brake pads and zinc from synthetic rubber tires). Some toxic metals are also present in petroleum-based lubricants and in gasoline and diesel fuel (i.e. cadmium).

*Id.* at 111. Again, the evidence is overwhelming and indisputable that Caltrans' highway stormwater discharges contain pollutants.

### 3. Defendant Admits Highway 162 Runoff Contains Pollutants.

At deposition, GCA Facility manager Mel Goodwin was presented with this photograph showing stormwater colored brown running off of Highway 162 and into the Bypass Pipe:



Doughty Decl., Dkt. 36 at 33, 51 (Goodwin Dep.). Asked, "is this typical of the appearance of water coming off of Highway 162," Defendant answered, "When it's raining hard, yes." *Id.* There can be no reasonable dispute that visibly brown water contains one or more pollutants.

Defendant sampled the influent to the Bypass Pipe on or around January 10, 2017, and testified that it was "high in turbidity." Doughty Decl., Dkt. 36 at 35-37 (Goodwin Dep.). Defendant thus admits that the Bypass Pipe discharges pollutants.

Defendant testified to further sediment loading to adjacent Highway 162 when "people across the highway had pioneered a road up there to their pot farm, and they did not do any erosion control or BMPs on it. And when it rained, that mud hemorrhaged down the hill, crossed the highway, into that ditch and into that pipe and into our sediment pond." Doughty Decl., Dkt. 36 at 38-39 (Goodwin Dep.). Defendant further testified that the erosive conditions "healed up," (*id.*) but there is no *de minimis* exception to CWA liability, and Defendant admits that the Highway 162 runoff the Bypass Pipe discharges at least sometimes contain pollutants.

GCA itself was cited on multiple occasions for allowing fugitive dust and vehicle dust tracking from its Facility onto adjacent Highway 162. Doughty Decl., Dkt. 36 (Goodwin Dep.) at 20-21 (acknowledging citations or warnings for track out problems at the Facility); *Id.* (speculating that dust tracked onto Highway 162 from GCA's facility might be because it was "in the evening"); *Id.* at 23 (acknowledging warning for fugitive dust emissions). Again, SWRCB explains that "[t]he main transport mechanism for these pollutants is through fine sediment. Once the contaminated fine sediments wash off the roadways and into storm drains or nearby receiving waters they re-suspend in the water column." Doughty Decl., Dkt. 36 at 111(Caltrans Storm Water Permit). Thus, there is no reasonable dispute that such pollutants are deposited on adjacent Highway 162, before becoming entrained and discharged in stormwater runoff from the Highway.

### 4. Plaintiff's Testimony Shows Pollutants Entering the Bypass Pipe.

On two occasions, Plaintiff obtained samples of stormwater runoff from Highway 162. Re-Filed Declaration of Lyn Talkovsky, Dkt. 37 at 6-7 ("Talkovsky Decl."). Plaintiff's

December 3, 2015 sample was obtained from the roadside ditch that collects Highway 162 runoff, upgradient from the Bypass Pipe, and was analyzed for fifteen separate pollutants, whereupon eleven pollutants were detected. Talkovsky Decl., Dkt. 37 at 6-7, 17. Plaintiff's December 6, 2015 sample was obtained at the inlet of the Bypass Pipe, again analyzed for fifteen separate pollutants, whereupon twelve were detected. Talkovsky Decl., Dkt. 37 at 6, 32.

Plaintiff submitted evidence of pollutants observed in storm water entering the Bypass Pipe.[2] Talkovsky Decl., Dkt. 37 at 6 ("On several occasions I have observed the water in the ditches alongside Highway 162 at the Longvale Facility location during wet weather events. The water has been visibly turbid each time.") Plaintiff's witnesses have also observed the accumulation of GCA's dust on Highway 162 (Talkovsky Decl., Dkt. 37 at 5 [discussing observations of GCA-generated dust on the road], Declaration of Doug Kerseg, Dkt. 35-10 at 3 [dust evident on vegetation beside Highway 162 at Longvale], Declaration of Sue Crews, Dkt. 35-5, at 3-4, 33-44 [same]). Both Caltrans and SWRCB have stated that buildup of sediment upon the state highway is the main source of pollutants entrained in stormwater discharges.

In sum, Plaintiff's stormwater samples and eyewitness accounts are fully consistent with: Defendant's stormwater samples and eyewitness accounts, Caltrans' stormwater sample results, SWRCB's findings, and the Congressional presumption that MS4 discharges contain pollutants. Thus, there can be no genuine dispute that Defendant's Bypass Pipe discharges pollutants.

### 5. Plaintiff's Expert Opines that the Bypass Pipe Discharges Pollutants.

Plaintiff's expert testimony further corroborates Plaintiff's percipient witnesses. Reviewing Plaintiff's Highway 162 runoff sample results, above, from 3 December 2015, and 6 December 2015, Plaintiff's expert notes that the stormwater "contains iron and aluminum levels exceeding toxicity concentrations for freshwater aquatic life." (Report of Plaintiff's Expert Steve Bond, Dkt. #35-1 at 13). Defendant submitted no facts disputing this opinion.

---

[2] Plaintiff also submitted evidence of visibly turbid water *exiting* the Bypass Pipe. Declaration of Jerry Albright, Dkt. 35-6 at 1-4 [photo of Bypass Pipe taken by kayaker].

### 6. Defendant Submitted No Facts Disputing the Evidence, Above.

As explained above, in support of summary judgment, Plaintiff submitted substantial fact and argument demonstrating no reasonable dispute of material fact that the Bypass Pipe discharges pollutants. In opposition, Defendant submitted the following evidence, discussed further, below: Declaration of Mel Goodwin ("Goodwin Decl.," Dkt. 51-2); Declaration of Sean Hungerford ("Hungerford Decl.," Dkt. 51-1); and Defendant's First Request for Judicial Notice ("Defendant's RJN," Dkt. 51-3). Because Plaintiff amply briefed the issue of pollutants discharging from the Bypass Pipe, Defendant had full opportunity to present evidence in opposition, and Defendant should not now be permitted to present any *new* evidence, for the first time, on motion for reconsideration, which is only proper "to consider material facts . . . <u>which were presented to the Court</u> . . ." Civil L.R. 7-9(b)(3)[emphasis added]. Accordingly, this Court has directed that these supplemental briefs be "based on the existing record." Dkt. 74, at 3:18. The existing record supports no reasonable dispute that the Bypass Pipe discharges pollutants. To summarize, Plaintiff's evidence consists of Caltrans stormwater sampling, State Waterboard findings, Plaintiff's sampling, Plaintiff's visual observations, Defendant's sampling, and Defendant's visual observations.

Defendant's Goodwin Declaration provides no facts disputing any of this evidence. Of relevance, Goodwin admits that "[t]he inlet to the Bypass Pipe is in one of the ditches on the north side of Highway 162. The ditch captures and collects water runoff from Highway 162 and directs the water to the inlet of the Bypass Pipe." Goodwin Decl., Dkt 46-2 at 4. Goodwin further asserts:

> GCA does not add or contribute industrial stormwater to the Bypass Pipe, either at the inlet/entrance to the pipe, or at the outflow. GCA's industrial activities do not affect the quality of Caltrans' discharges from Highway 162 in any way. . . . I am also aware of speculation that 'track out' dust from the Facility entrance may have entered the Bypass Pipe. To my knowledge, this has never occurred. The Bypass Pipe inlet is not in proximity but is approximately 400 feet east of the Facility entrance.

*Id.*, at 4. First, this testimony does not refute Plaintiff's evidence that Defendant's airborne dust settles on Highway 162, nor that Defendant's vehicles track sediment onto Highway 162.

Plaintiff presents this evidence to show that Highway 162 receives the same types of pollutant loading as described by Caltrans and SWRCB in their extensive findings that highway stormwater contains pollutants. Goodwin testifies he has no "knowledge" that Defendant's pollutants have entered the Bypass Pipe, but this does not provide evidence it does not occur. Defendant admits to not monitoring the Bypass Pipe for pollutants. Stipulation, Dkt. 57 at 4.

Goodwin further declares that "GCA monitors the integrity of the Bypass Pipe as it passes through the Facility in order to be certain that it remains intact," thus admitting that any pollutants that enter the Bypass Pipe do discharge to Outlet Creek. Goodwin Decl., Dkt. 46-2 at 5. "GCA does not, however, collect samples from the inlet or outflow of the Bypass Pipe as part of its normal practice, or under the IGP. GCA also does not maintain any practice of visually observing water flowing into or out of the Bypass Pipe. . . . I have no knowledge of whether any pollutants discharged by Caltrans into the Bypass Pipe are at levels above or below the requirements of Caltrans' own permit." *Id.* Goodwin's testimony that Defendant lacks knowledge of the Bypass Pipe discharging pollutants is insufficient to refute Plaintiff's evidence that it does.

Goodwin offers no further testimony regarding pollutant discharge from the Bypass Pipe. The Goodwin Declaration evidence therefore creates no reasonable dispute of fact.

Next, Defendant's Declaration of Sean Hungerford seeks to authenticate five exhibits: (1) the Industrial General Stormwater Permit, (2) the Caltrans MS4 Permit, (3) waterboard site inspection notes, (4) a waterboard site inspection report, and (5) an expert rebuttal report. (Hungerford Decl., Dkt 46-3 at 2-3; *see also* Defendant's RJN, Dkt. # 51-3 [submitting same].) The Industrial General Stormwater Permit does not discuss Caltrans' runoff. The Caltrans MS4 Permit extensively documents that Caltrans' stormwater contains pollutants. Exhibit three contains inspection notes of waterboard staff. Hungerford Decl., Dkt. 46-3 at 53. The notes indicate inspection is for compliance with the Industrial General Stormwater Permit (*id.*) which the Court has already determined does not regulate the Bypass Pipe discharges, and is therefore not relevant. Nevertheless, the notes state that the "Bypass pipe from Caltrans drainage ditch on

Hwy 162 has been repaired, allowing for relatively clean runoff to be directly discharged to the creek." *Id.* at 55. Here, the characterization of Highway 162 runoff as "*relatively*" clean, as opposed to completely clear, implies a staff belief that the discharge is not *completely* free from pollutants. Nevertheless, the note constitutes pure speculation, as the notes state that the inspection occurred just "*prior to forecast of heavy sustained rainfall*," indicating that the Bypass Pipe was not yet discharging at the time of the dry weather inspection. *Id.* at 54. A previous inspection note also states that "[r]oad runoff from highway 162 now bypasses site via drain pipe," but offers no characterization of the Highway 162 discharge. *Id.* at 55.

Hungerford Declaration Exhibit 4 consists of a more extensive waterboard site inspection report. Dkt. 46-3 at 57-62. The report never mentions the Bypass Pipe or Highway 162 runoff. *Id.*

Hungerford Declaration Exhibit 5 excerpts Defendant's "Rebuttal Expert Report," and highlights rebuttal of Plaintiff's Expert testimony that "'spillage from the Facility [aggregate] piles are getting into stormwater conveyance,' and into Outlet Creek." Dkt. 46-3 at 66. Plaintiff is not relying on this testimony in this supplemental brief. The Defendant's Rebuttal Expert Report testimony offered includes no discussion of the Bypass Pipe or Highway 162 runoff.

In sum, then, none of Defendant's submitted evidence offers any facts to refute Caltrans' own stormwater characterization report, the State Waterboard's characterization of Caltrans' pollutants, Plaintiff's samples and observations of Bypass Pipe discharges, or Defendant's own samples and observations of Bypass Pipe discharges. Given this evidence, no reasonable finder of fact could conclude that the Bypass Pipe never discharges pollutants, and summary judgment is appropriate.

**C.    The Court Did Not Err in its Initial Assessment of Statutory Penalties.**

Plaintiff seeks an award of civil penalties against Defendant to deter future CWA violations at the Facility, and help remove any economic benefits achieved by noncompliance. According to the Ninth Circuit, "[i]f a district court finds a CWA violation, then civil penalties under 33 U.S.C. § 1319(d) are mandatory." *Natural Resources Defense Council v. Southwest*

*Marine, Inc.*, 236 F.3d 985, 1001-02 (9th Cir. 2000)(citing *Leslie Salt, Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir. 1995). On March 23, 2018, this Court properly imposed statutory penalties for 70 documented violations at $37,500 per day per for violations occurring since May 1, 2011, and $51,570 per day for violations since November 3, 2015. Dkt. 59 at 17 (citing 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.) Plaintiff seeks reinstatement of that award, or, in the alternative, a determination that Defendant violated the CWA for at least an additional seventy (70) days, for a total of 140 days of violations.

The Court was fully within the law to impose the statutory penalty for each violation. "Once the court has calculated maximum civil penalties, the court may proceed to adjust downward from this maximum based on statutory factors." *Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC*, 205 F. Supp. 3d 1128, 1155 (E.D.Cal. 2016)(emphasis added); *see also, Hawaii's Thousand Friends v. City & Cty. of Honolulu*, 821 F. Supp. 1368, 1395 (D. Haw. 1993)("If the court chooses *not* to impose the maximum penalty, 'it must reduce the fine in accordance with the factors spelled out in section 1319(d); clearly indicating the weight it gives to each of the factors and the factual findings that support its conclusion,'" (emphasis added)); *Atl. States Legal Found., Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990)("the district court should first determine the maximum fine for which [Defendant] may be held liable. *If it chooses not to impose the maximum*, it must reduce the fine in accordance with the factors spelled out in section 1319(d), clearly indicating the weight it gives to each of the factors in the statute and the factual findings that support its conclusions," (emphasis added).")

The policy ramifications of this approach are evident. Were a court *required* to weigh every fact related to every penalty factor, the resulting precedent would operate as a *de facto* lowering of the express statutory penalties, *i.e.*, similarly situated operators would know that the maximum penalties they would face for noncompliance would be capped by case law rather than by statute, such that the deterrent effect would be less than that set by Congress. However, the Supreme Court has recognized that:

> Congress has found that civil penalties in Clean Water Act cases do more than promote immediate compliance by limiting the defendant's economic incentive to delay its attainment of permit limits; they also deter future violations. . . . It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress. Civil penalties can fit that description. To the extent that they encourage defendants to discontinue current violations and deter them from committing future ones, they afford redress to citizen plaintiffs who are injured or threatened with injury as a consequence of ongoing unlawful conduct.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Services*, 528 U.S. 167, 185-186 (2000). This effect would be considerably minimized were a court precluded from imposing the express statutory penalties, and, instead, have its discretion limited to a comparison of facts in other penalty cases.

As discussed: Defendant does not dispute that the "Bypass Pipe conveys municipal storm water runoff from Highway 162 to Outlet Creek" (Stipulation, Dkt. 57 at 3); the evidence demonstrates that the Bypass Pipe, in fact, discharges pollutants; and the Court has determined that Defendant does not possess any CWA permit authorizing such discharges. Therefore, the Court's only task in assessing civil penalties is determining the number of days of violation.

In support of summary judgment, Plaintiff submitted rain data obtained from a federal agency website showing local rainfall from November 17, 2013, through December 19, 2017.[3] Defendant did not object to this evidence and any objection on reconsideration is late should not be considered. Def. Mem., Dkt. 51 at 12-15. The rain data shows seventy (70) days of at least **one inch** of precipitation, far more than is needed to cause a discharge from the Bypass Pipe. For example, and as discussed further, below, Plaintiff's witness observed the Bypass Pipe discharging, water flowing into the Bypass Pipe, or the Bypass Pipe submerged by heavy rains, during rain events as low as 0.01, 0.02, 0.06, 0.13, and 0.15 inches of precipitation. Doughty Decl., Dkt. 36 at 157-157. By comparison, a rain even of one inch is *one hundred times more rain* than existed when the Bypass Pipe was observed to discharge in 0.01 inches of rain. In addition, Defendant's Stormwater Pollution Prevention Plan states, "As defined by the General

---

[3] Whereas the Court has requested this brief on the existing factual record, Plaintiff has not updated this rain table for rain events following December 19, 2017. Plaintiff contends, however, that additional days of discharge occurred after December 19, 2017.

Permit, a qualifying storm event is defined as any storm producing 0.5 inches or more of rainfall," and therefore triggers stormwater monitoring requirements. Goodwin Decl., Dkt. 46-2 at 25. Here, the uncontested rainfall data show one hundred and forty (140) days of rain at 0.5 inches or more. Dkt. 36 at 153-161. When compared to the observed discharges, above, Defendant similarly possesses no facts to reasonably dispute that the Bypass Pipe has illegally discharged during each storm event of at least 0.5 inches. Again, there is no *de minimis* exception to the requirement to obtain a CWA permit for a point source that discharges pollutants to waters of the U.S. *See Comm. to Save Mokelumne River v. East Bay Mun. Utility Dist.*, 13 F.3d 305, 309 (9th Cir. 1993), cert. denied, 513 U.S. 873 ("the Act categorically prohibits *any* discharge of a pollutant from a point source without a permit," [emphasis added]); *Puget Soundkeeper Alliance v. Cruise Terminals of Am., LLC*, 216 F.Supp.3d 1198, 1205 (W.D. Wash. 2015)("Liability for a violation of the Clean Water Act is strict, i.e., there is no *de minimis* defense"). Accordingly, the Court did not err in determining that there is no reasonable dispute that Defendant violated the CWA by discharging pollutants from the Bypass Pipe *at least* seventy (70) times since November 2013, during days of one inch of precipitation or more. Moreover, the Court has sufficient evidence to find no reasonable dispute that a discharge occurred at least one hundred forty (140) days where rainfall equaled or exceeded 0.5 inches.

First hand witness testimony supports these findings. The Bypass Pipe was observed to be discharging into Outlet Creek on January 20, 21, and 30, 2016, and March 8-9 and 11-12, 2016. Declaration of Sue Crews ("Crews Decl."), Dkt. 35-5 at 2-3; Declaration of Jerry Albright Dkt. 35-6 at 1-4. Stormwater was observed entering the Bypass Pipe on December 3 and 6, 2015, January 1, 2016, and February 9, 2017. Talkovsky Declaration, Dkt. 37 at 5-8. And the Bypass Pipe outlet was observed to be submerged by Outlet Creek on March 7, 13-14, 2016 and February 7-10, 2017. Crews Decl. Dkt 35-5 at 2-3. Defendant has offered no facts suggesting that the Bypass Pipe did not discharge on these occasions. Therefore, based on the uncontradicted witness testimony, the Bypass Pipe discharged to Outlet Creek on at least these twenty-two (22) days.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this Court re-enter an award of summary judgment as to Plaintiff's claim that Defendant's Bypass Pipe unlawfully discharges pollutants from a point source to waters of the U.S. without a CWA permit. Plaintiff further requests that the Court's injunction prohibiting Defendant from discharging from the Bypass Pipe without a CWA permit be reinstated, and that the Court's penalty determination be reinstated, or modified to find one hundred and forty (140) days of violations.

Respectfully submitted, AQUA TERRA AERIS LAW GROUP

Dated: September 4, 2018

/s/ Jason R. Flanders
Jason R. Flanders
Counsel for Plaintiff
Friends of Outlet Creek